UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

| | |
|---|---|
| COMMERCIAL TENANT SERVICES, INC.<br><br>                          Plaintiff,<br><br>  -against-<br><br>PENSKE BUSINESS MEDIA, LLC,<br><br>                          Defendant. | 20-cv-9756 (SHS)<br><br>OPINION & ORDER |

SIDNEY H. STEIN, U.S. District Judge.

Plaintiff Commercial Tenant Services ("CTS") has moved for summary judgment as to the liability of defendant Penske Business Media ("PBM") for alleged breach of contract. PBM in turn has cross-moved for partial summary judgment as to its liability. For the following reasons, the Court denies plaintiff's motion for summary judgment in its entirety and grants defendant's motion in part and denies it in part.

### I.  FACTUAL BACKGROUND

PBM has an office at 475 5th Avenue in Manhattan (the "Building"). It leases or has previously leased the 2nd, 3rd, 4th, 5th, 10th, 14th, 16th, 19th, and 24th floors. PBM signed a lease for the 2nd, 3rd, 14th, and 16th floors of the Building in December 2014; it added the 19th and 24th floors in June 2018, followed by the 10th floor in October 2018, and the 4th and 5th floors in February 2020. (Defendant's Statement of Undisputed Material Facts, ECF No. 14-1.)

The lease required PBM to pay its share of the Building's operating expenses and real estate taxes to its landlord based on the percentage of the Building that it leased. (Lease at ¶ 3, Declaration of Kenneth Kutner dated Oct. 7, 2021 ("Kutner October Decl."), ECF No. 32 Ex. B.) PBM's liability for real estate taxes is measured against a particular "base year," which differs depending on the particular floor: 2016-17 is the base year for the 10th floor; 2017-18 for the 4th and 5th floors; and 2019-20 and 2020-21 for the 2nd, 3rd, 16th, 19th, and 24th floors. (Lease at ¶ 13.)

In June 2017, PBM and CTS entered into an agreement (the "Agreement") whereby CTS would audit PBM's portion of the operating expenses for the Building. (See Declaration of Kenneth Kutner dated Sept. 3, 2021 ("Kutner September Decl."), ECF No. 19 Ex. A.) Pursuant to the Agreement, CTS is entitled to receive for its work 30% of "all refunds and credits received by PBM on account of rent overcharges that CTS might

1

identify for the then current and previous lease or fiscal years, whether those refunds were in the form of payments of money or credits against future rent or otherwise." (Compl. ¶ 27, ECF No. 1-1; Agreement, Kutner September Decl., ECF No. 19 Ex. A., ¶ 4.)

In August 2019, CTS identified potential overcharges regarding real estate taxes with respect to the 10th floor of the Building. (Defendant's Local Rule 56.1 Statement, ECF No. 14-1.) In particular, CTS had determined that PBM's landlord had received an abatement for that space through New York City's Industrial and Commercial Abatement Program ("ICAP abatement") for 2016/2017.[1] (Kutner September Decl., ECF No. 19 Ex. E.) The ICAP abatement was a 10 year abatement that resulted in overcharges to PBM of $70,892.83 for 2018/19 and $76,518.16 for 2019/2020 for the 10th floor. *Id.* Emails from CTS to PBM identified that, with respect to the 10th floor, the incorrect calculations would result in overcharges of $606,520 before the lease expired in June 2026. *Id.*

CTS now seeks $215,372.27 in unpaid fees plus interest from PBM on the grounds that the landlord adjusted PBM's real estate tax liability downward for other floors in the Building based on CTS's discovery of the ICAP abatement discrepancy with respect to the 10th floor and that it is entitled to 30% of these savings. (Compl. ¶ 42, ECF No. 1-1.)

### A. The Agreement

The dispute between the parties is contractual. Pursuant to the Agreement, CTS was "to review and analyze PBM's submitted leases, rent statements . . . and seek to determine whether PBM has been or is being overcharged in . . . its rent, rent taxes or other related charges, or has been, undercharging, or is otherwise owed payments from, any tenant or subtenant(s) in any way, if any ("Identifications")." (Agreement, Kutner September Decl., ECF No. 19 Ex. A, ¶ 1.)

According to the Agreement, after CTS makes an Identification, "PBM . . . shall attempt to obtain Refunds as hereinafter defined: . . . all refunds, credits, savings . . . arising under any prior lease, the current lease or any renegotiated leases or other consideration, financial, transactional, or otherwise." (Agreement, ¶ 2.) "Refunds given to or on behalf of PBM for overcharges as well as reductions in future bills and/or liabilities under the lease resulting from adjustments or changes in the methods by

---

[1] "This program provides abatements for property taxes for periods of up to 25 years. To be eligible, industrial and commercial buildings must be built, modernized, expanded, or otherwise physically improved." *Industrial & Commercial Abatement Program*, NYC DEP'T OF FINANCE, https://www1.nyc.gov/site/finance/benefits/benefits-industrial-and-commercial-abatement-program-icap.page (last visited July 12, 2022).

2

which the landlord or tenant calculates any escalation or other charge made shall be considered part of Refunds for purposes of determining CTS' fees." (*Id.*)

Further, "[i]f no Refunds are achieved to or on behalf of PBM, there are no charges to PBM. Accordingly, PBM shall not be liable unless PBM receives or earns Refunds. Further, PBM shall not be liable if Identifications are made and PBM shall elect, in is sole discretion, not to pursue and does not thereafter pursue obtaining such Refunds of Identifications. PBM shall promptly notify CTS in writing of any such election not to pursue Refunds of Identifications." (*Id.*, ¶ 3.) In addition, the Agreement stipulates that "fees payable to CTS under this Agreement will not be reduced should PBM enter into any agreement with the landlord or other person or entity which would otherwise reduce . . . the fee . . . payable to CTS." (*Id.*, ¶ 5.) The Agreement also provides that "CTS shall have the authority, subject to PBM's approval, to negotiate adjustments on behalf of PBM and to agree to settlements reached on behalf of PBM. PBM agrees that CTS' retention is to be exclusive as to the locations submitted for review. CTS reserves the right to choose not to proceed as to any possible Identifications." (*Id.*, ¶ 6.)

The Agreement stipulates that "for two (2) years subsequent to [the] year of date of final settlement [with its landlord], PBM agrees to pay CTS thirty percent (30%)" of Refunds it receives (*Id.* ¶4) and provides for interest of 1.5% per month "payable on any amounts not paid within thirty (30 days)" and "[a]ll attorneys' fees or other costs incurred in collecting any delinquent amount" payable by PBM to CTS. (*Id.* ¶ 9.)

The final relevant provision stipulates that:

> For each location, CTS' services hereunder shall cease upon PBM's written decision not to proceed to obtain Refunds. PBM may sooner terminate CTS' service upon fifteen (15) business days advanced written notice to CTS. Any election not to proceed or termination of said services does not release PBM of any fee(s) that may become due and owing to CTS from any Refunds subsequently received by PBM or to which CTS may be entitled in accordance with the terms of this Agreement.

(*Id.* ¶ 12.)

## II. PROCEDURAL POSTURE

In October of 2020, CTS filed this lawsuit in the New York Supreme Court, New York County against PBM, bringing four claims for relief: (1) a claim for breach of contract; (2) a claim for quantum meruit; (3) a declaratory judgment action regarding the parties' obligations under the agreement; and (4) a claim for attorneys' fees. (Compl., ECF No. 1-1.) Following the suit's removal to federal court on the basis of diversity jurisdiction, (Notice of Removal, ECF No. 1), PBM filed an answer denying essentially all of CTS's claims. (Answer, ECF No. 5.)

CTS has now moved for summary judgment on its claims for breach of contract and attorneys' fees and costs. PBM has cross-moved for partial summary judgment, contending that it is not liable to plaintiff for fees related to the auditing of real estate taxes for the 2nd, 3rd, 4th, 5th, 14th, 16th, 19th, and 24th floors of the Building, and seeking summary judgment in its favor on CTS's breach of contract, quantum meruit, and declaratory judgment claims as to those floors. Defendant does not move for summary judgment with respect to the 10th floor.

### III. APPLICABLE LAW
#### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

#### B. Principles of Contract Interpretation

"A federal court sitting in diversity must apply the choice of law rules of the forum state, in this case New York." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1541, 1538 (2d Cir. 1997).

> In contract cases, New York courts ... apply a 'center of gravity' or 'grouping of contacts' approach. Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties.

*Brink's Ltd v. S. African Airways*, 93 F.3d 1022, 1030–31 (2d Cir. 1996), *cert denied*, 519 U.S. 1116 (1997).

Accordingly, the Court will analyze the nature of any "significant contacts" the parties have with New York in connection with this matter. Plaintiff's principal office is located in New York, the Building is in New York, and the alleged breaches took place in New York. The Court concludes that the "center of gravity" of the parties' dispute is therefore in New York, and New York law controls this matter.

The elements of a breach of contract claim under New York law are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Hous. Corp.*, 913 N.Y.S.2d 161, 161 (N.Y. App. Div. 2010). Contract interpretation is rooted in the "familiar and eminently

4

sensible proposition of law that, when parties set down their agreements in a clear, complete document, their writing should be enforced according to its terms." *159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 132 (N.Y. 2019) (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2005)) (alterations omitted). Contract interpretation "must give the words and phrases employed their plain meaning." *Laba v. Carey*, 277 N.E.2d 641, 644 (N.Y. 1971). Contract interpretation is a question of law where the contract is unambiguous; but "[i]f there is ambiguity in the terminology used . . . and determination of the intent of the parties depends on the credibility of extrinsic evidence . . . then such a determination is to be made by the jury." *Hartford Acct. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973).

## IV. DISCUSSION

The Court must decide whether a genuine issue of material fact exists as to the following issues: 1) PBM's liability to CTS as to the 2nd, 3rd, 14th, 16th, 19th, and 24th floors of the Building ("Original Space") and 2) PBM's liability to CTS as to the 4th and 5th floors of the Building. The viability of CTS's claim for attorney's fees and costs depends on the resolution of those two issues. The Court must also decide whether to grant summary judgment in PBM's favor as to CTS's quantum meruit and declaratory judgment claims.

### A. The Original Space

The Court has determined that a genuine dispute of material fact exists as to whether CTS is owed commissions as to the Original Space. PBM contends that is not liable to CTS for commissions as to the Original Space because it would only be required to pay CTS a 30% commission 1) if CTS made "Identifications" of past or current overcharges for real estate taxes; 2) if, in response to such Identifications, PBM elected to pursue "Refunds" from its landlord; and 3) if PBM subsequently did receive Refunds from its landlord related to the overcharges encompassed by CTS's Identifications. In PBM's view, CTS identified, and PBM received, Refunds related to an overcharge with respect only to the 10th floor when it discovered that PBM's landlord had failed to account for the ICAP abatement. PBM contends that any overcharge as to the Original Space would be hypothetical because the landlord never issued invoices to PBM regarding real estate tax overcharges for those floors.

CTS counters that the methodology PBM's landlord used to calculate PBM's real estate tax liability as to the 10th floor would have incorporated CTS's Identification of the ICAP abatement discrepancy; that the same methodology would apply to its calculations for other floors of the Building; and that this therefore resulted in real estate tax savings to PBM as to the Original Space; i.e., floors 2, 3, 14, 16, 19, and 24.

PBM is correct that the Agreement applies only to current or past overcharges to PBM; it does not apply to future, hypothetical overcharges. According to the Agreement, "CTS agrees to review and analyze PBM's submitted leases, rent statements, electric billings, and escalation statements and seeks to determine whether PBM *has been* or *is being* overcharged, or *is* otherwise overpaying or *has* overpaid . . . ." (Agreement ¶ 1, Kutner September Decl., ECF No. 19 Ex. A) (emphasis added). The contract's use of the present tense and past tense is unambiguous; the plain meaning of these verb tenses indicates that only past or existing overcharges are covered for the purposes of CTS's commissions. *See Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1005 (N.Y. 2014) ("[T]he use of present tense language . . . demonstrates . . . that the Agreement would only bind affiliates in existence."). Here, CTS's Identification as to the 10th floor certainly constitutes a past or current overcharge to PBM.

However, the Agreement is also clear that CTS would still be entitled to commissions from PBM based on *future* bills if those past or current overcharges caused the landlord to change its method of calculating PBM's real estate taxes going forward. The Agreement specifically provides that "Refunds given to . . . PBM for overcharges . . . *in future bills and/or liabilities under the lease resulting from adjustments or changes in the methods by which the landlord . . . calculates any . . . charge made shall be considered part of Refunds for purposes of determining CTS' fees.*" (Agreement ¶ 2) (emphasis added). Therefore, if the landlord made changes to its calculation of PBM's real estate taxes as to the other floors based on the Identification CTS made as to the 10th floor, CTS would be owed a 30% commission under the Agreement.

Despite the clarity of the Agreement, there remains factual ambiguity as to whether CTS's 10th floor Identification resulted in "adjustments or changes in the methods" used by PBM's landlord to calculate PBM's tax burden for the floors of the Original Space. According to PBM, an email from CTS auditor Chris Coleman and PBM executives Judith Margolin and Todd Greene reveals that CTS acknowledged that the landlord had not overcharged PBM for the floors other than the 10th floor. (Kutner September Decl., ECF No. 19 Ex. E.) At best, this is an inference based on the fact that Coleman's email acknowledged that the real estate tax payments for some non-10th floors did not begin until July 2020, which was 11 months after CTS had conducted its audit in 2019. PBM also points to emails between it and its landlord that it claims support the contention that it received refunds only for the 10th floor (*See* Kutner September Decl. ECF No. 19, Ex. H.); however, these emails do not contain confirmation that the landlord did in fact limit to the 10th floor the ICAP abatement adjustment in its calculations of PBM's real estate taxes. At best, they support only the notion that the ICAP abatement adjustment was applied to the 10th floor. Factual ambiguity remains as to whether the landlord changed its methodology of calculating the ICAP abatement

6

adjustment and, if it did, whether the changes were based on CTS's Identification for the 10th floor.

Regardless, PBM argues that it should not be liable because the Agreement leaves within PBM's "sole discretion" whether to seek Refunds based on CTS' identifications. The Agreement is not so straightforward: it is ambiguous as to whether PBM's power to decline pursuing Refunds eliminates its liability to CTS for commissions. On one hand, the Agreement provides that "PBM shall not be liable if Identifications are made and PBM shall elect, in its sole discretion, not to pursue and does not thereafter pursue obtaining such Refunds of Identifications." (Agreement ¶ 3, Kutner September Decl., ECF No. 19 Ex. A.) This power requires PBM to "promptly notify CTS in writing of any such election not to pursue Refunds of Identifications." (*Id.*) The Agreement relatedly stipulates that CTS's Identification services "shall cease upon PBM's written decision not to proceed to obtain Refunds" and that "[a]ny election not to proceed or termination of said services does not release PBM of any fee(s) that may become due and owing to CTS from any Refunds subsequently received by PBM or to which CTS may be entitled in accordance with the terms of this Agreement." (Agreement ¶ 12.) These two provisions are in tension with one another, with the former purporting to release PBM from liability should it decline to pursue Refunds that CTS has identified and the latter requiring PBM to notify CTS of its decision to decline any Refunds and that it may still be liable to CTS as to certain "fee(s) . . owing to CTS from any Refunds subsequently received by PBM."

In sum, both factual ambiguity and legal ambiguity prevent this Court from granting summary judgment in favor of either CTS or PBM. The resolution of these ambiguities is best left to the province of a jury.

### B. The Fourth and Fifth Floors

PBM contests its liability as to the 4th and 5th floors of the Building for the same reasons as it does for the Original Space while adding that the complaint fails to mention either floor in the context of any of its claims. CTS counters that it was unaware of these floors when this litigation began and only learned about them during discovery. PBM states, and CTS does not dispute, that PBM added the floors to its lease in February 2020. (Def. Reply Statement of Undisputed Material Facts at ¶ 5, ECF No. 37-1.)

"A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion." *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 95-cv-10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004). The Court set April 12, 2021 as the deadline for amending the pleadings in this action. (Order dated Jan. 14, 2021, ECF No. 9.) CTS did not amend the complaint to reflect any claims for the 4th and

5th floors. CTS claims it did not know about the 4th and 5th floors before engaging in discovery but does not provide any further justification for why it did not amend the pleadings prior to the April 12 deadline, which occurred approximately 14 months after PBM added the 4th and 5th floors to its lease in February 2020. Given the 14 months CTS had to verify whether PBM had added any additional floors to the lease, especially because it had knowledge that PBM had added floors to its lease at different times in the past, summary judgment is granted in PBM's favor as to CTS's claims regarding the 4th and 5th floors.

### C. Quantum Meruit and Declaratory Judgment

Summary judgment is granted in favor of PBM with respect to CTS's claim for quantum meruit. "[A] valid contract 'governing a particular subject matter ordinarily precludes [quantum meruit] recovery . . . for events arising out of the same matter.'" *John F. Dillon & Co. LLC v. Foremost Mar. Corp.*, No. 02-cv-7803 (SHS), 2004 WL 1396180, at *12 (S.D.N.Y. June 21, 2004) (quoting *Integral Control Sys. Corp. v. Consol. Edison Co. of New York*, 990 F. Supp. 925, 303 (S.D.N.Y. 1998)). The Agreement clearly covers the disputed issues in this case. The Agreement defines "Refunds" to include "rent tax savings" and all "other consideration, financial, transactional, or otherwise." (Agreement ¶ 2, Kutner September Decl., ECF No. 19 Ex. A.) Moreover, the Refunds, if obtained by PBM, result in a 30% commission to CTS under the contract. (*Id.* ¶ 4.) Accordingly, any real estate tax Refunds PBM obtained as a result of CTS's Identifications are subject to the 30% commission. Because the parties' contract clearly encompasses the alleged commissions CTS is owed, CTS cannot also seek recovery under a theory of quantum meruit.

Summary judgment is also granted in favor of PBM with respect to CTS's claim for a declaratory judgment. "Federal law determines whether a federal court can and may properly render a declaratory judgment." *M. Swift & Sons, Inc. v. Lemon*, 24 F.R.D. 43, 45 (S.D.N.Y. 1959). *See also* 28 U.S.C. § 2201. "The Declaratory Judgment Act . . . vests a district court with discretion to exercise jurisdiction over a declaratory action." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). District courts have "a broad grant of discretion . . . to refuse to exercise jurisdiction over a declaratory judgment action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). "In order to decide whether to entertain an action for declaratory judgment, . . . district courts [must] ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade*, 411 F.3d at 389.

Here, plaintiff's declaratory judgment claim does not "serve a useful purpose in clarifying or settling the legal issues," nor would it "finalize the controversy and offer

relief from uncertainty"; plaintiff's the breach of contract claim governs the substance of this dispute. "When a party asks the Court to declare that the opposing party has breached a contract and that party 'has a legal remedy for breach of contract, its cause of action for declaratory judgment should [not survive].'" *India Globalization Cap., Inc. v. Apogee Fin. Invs., Inc.*, No. 21-cv-1131 (VEC), 2022 WL 671172, at *11 (S.D.N.Y. Mar. 4, 2022) (quoting *Ness Techs. S.A.R.L. v. Pactera Tech. Int'l Ltd.*, 173 A.D. 635, 636 (N.Y. App. Div. 2019. Plaintiff's declaratory judgment claim is plainly "duplicative" of its breach of contract claim. *India*, 2022 WL 671172, at *10. Accordingly, this Court declines to exercise jurisdiction over the claim and grants summary judgment with respect to it in PBM's favor.

## V.  CONCLUSION

In light of the foregoing analysis, plaintiff's motion for summary judgment is denied; defendant's motion for partial summary judgment is granted in part and denied in part.

The remaining claims to proceed to trial are as follows: (1) plaintiff's breach of contract claims as to commissions it may be owed for real estate tax Identifications as to the 2nd, 3rd, 14th, 16th, 19th, and 24th floors of PBM's Building and (2) plaintiff's claim for attorney's fees. Summary judgment in PBM's favor disposes of plaintiff's claims as to the 4th and 5th floors, quantum meruit, and declaratory judgment. Trial will commence on March 13, 2023; a joint pretrial order, any motions *in limine*, proposed *voir dire*, and proposed jury charges are due by February 6, 2023; responses to any motions *in limine* are due by February 13, 2023; a final pretrial conference in this matter will take place on February 24, 2023 at 10:00 a.m. in Courtroom 23A, 500 Pearl St, New York, NY.

Dated: New York, New York
       September 16, 2022

SO ORDERED:

*Sidney H. Stein*
Sidney H. Stein, U.S.D.J.